ADAMS, J.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ANTHONY HARRIS, | ) | CASE NO.  5:03CV1827 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| v. | ) | |
| | ) | <u>MEMORANDUM OF OPINION</u> |
| AMANDA SPIES BORNHORST, et al., | ) | <u>AND ORDER</u> |
| | ) | [RESOLVING DOC. 156-1] |
| Defendants. | ) | |
| | ) | |

     This action is before the Court upon the Motion for Summary Judgment of defendants Amanda Spies and County of Tuscarawas, Ohio (Doc. 156-1).  The Court has reviewed the memorandum in support, memorandum in opposition (Doc. 172), and reply memorandum (Doc. 184) and has considered the entire record in this matter.  For the reasons set forth below, the Court will grant the motion.

**I.**

     Five year old Devan Duniver was brutally murdered.  On June 27, 1998, she disappeared from her home in New Philadelphia, Ohio.  Plaintiff Anthony Harris, who was Devan's neighbor, was the first person seen coming from the area where Devan's body was discovered. Her body was found in a wooded area behind her home the next day.  Plaintiff, an African-American, was 12 years old at the time.  The Harris family was one of only a few African-American families in the area where they lived.  From the outset, Anthony Harris was one of the persons of interest for this murder.  The day after Devan was found dead, the plaintiff told police that "she was a rude, nasty little girl who would eat in front of him." Urban

Deposition (Doc. 165) at 253.  The New Philadelphia Police learned during their investigation that the plaintiff had threatened to kill Devan.  Plaintiff initially provided the police with inconsistent statements regarding whether he was in the area where Devan's body was discovered near the suspected time of her death.  Plaintiff, however, later admitted that he was in that area at that time.

With this knowledge, Ms. Spies (the Chief Prosecutor for Tuscarawas County) suggested that the police give the juvenile suspects, including the plaintiff, a computerized voice stress analyzer test to help determine their degrees of candor.  Ms. Spies was not involved in acquiring consent for the plaintiff or in performing the test; nor was she even present during the interview.

On July 15, 1998, the police went to the Harris residence and asked that the plaintiff submit to the voice stress test.  Plaintiff and his mother, Cynthia Harris, consented to the test.  Ms. Harris drove her son to the New Philadelphia police station for the voice stress analyzer test knowing that the police were having trouble eliminating him as a suspect.  Plaintiff and his mother signed a pre-printed Consent to Computerized Voice Stress Analyzer Examination (Truth Verification) form. *See* Doc. 156-3.  Captain Jeffrey Urban[1] led the investigation because the murder took place in his jurisdiction.  Since Captain Urban was not familiar with the voice stress analyzer test, Chief Thomas Vaughn of the Millersburg Police Department was called in to implement the test.  Ms. Spies had never met nor spoken to Chief Vaughn until after Harris confessed to Devan's murder.  She did not know that Chief Vaughn had training in the

---

[1]Jeffrey Urban became Chief of the New Philadelphia Police Department in 2002.

2

confrontational, aggressive "Reid" or "Glen Foster" interrogation methods.  Ms. Spies was aware, however, that Chief Vaughn *Mirandized* the plaintiff.

Unbeknownst to Ms. Spies, instead of performing the voice stress test, Chief Vaughn began interrogating the plaintiff.  With his mother present and watching--but unable to hear--the recorded interrogation from an adjoining room at the police station, the plaintiff confessed to the police that he had murdered his five year old neighbor, Devan Duniver.  Chief Vaughn insinuated during the interrogation that the plaintiff may have been angry with Devan because Anthony is black.  He told the plaintiff, "a lot of African Americans got a lot of hate built up over the years and it's because of what we did to you, you know.  It wasn't me that did it but it was my forefathers, and it wasn't a nice thing and there's people in this world that are racist."  Complaint (Doc. 1, Ex. A) at 275.  Contemporaneously, on the other side of the one-way mirror, Captain Urban told Cynthia Harris, "there's so many issues . . . in regard to you know, blacks being angry how they've been treated by whites and that there are a lot of angry black men out there." Amended Complaint (Doc. 70) at ¶ 93; Cynthia Harris Deposition (Doc. 176, Ex. E) at 205-206.

When asked what Devan did to make him so mad, the plaintiff said that "she was being a pain in the ass" and "hit me with a brick." Harris Deposition (Doc. 159) at 198-99.  The plaintiff provided details during the interview that led those involved to suspect that he was responsible for Devan's death. *See* Transcript of Proceedings in the Juvenile Court (Doc. 187, Ex. 9, Binder 1) at 259-60, 279-80, and 291-93.  After the plaintiff confessed, Ms. Spies was called to the police station and informed that Anthony Harris had confessed to the murder.  Captain Urban decided to arrest the plaintiff.  When Ms. Spies learned that the plaintiff had confessed to the

3

crime on tape, she initiated criminal proceedings against him by filing a criminal complaint on July 16, 1998, alleging that he murdered Devan.

A trial judge subsequently conducted a probable cause hearing, heard evidence tested by cross-examination, and determined that probable cause existed to arrest and prosecute the plaintiff for murder. *See* Transcript of Proceedings in the Juvenile Court (Doc. 187, Ex. 6) at 22. Plaintiff entered a denial to the charge and filed motions to suppress.  The Tuscarawas County, Ohio Juvenile Court partially granted the motions.  The juvenile court, however, denied the plaintiff's motion to suppress statements he made to Chief Vaughn, during the questioning on July 15, 1998.  The court found that the plaintiff was not in custody at the time he made incriminating statements and that his confession complied with constitutional requirements. *See* Judgment Entry filed in the Juvenile Court (Doc. 187, Ex. 10).  Accordingly, the plaintiff's confession was presented at the adjudicatory hearing that began in February 1999, along with other circumstantial evidence.  The six-week-long trial was broadcast on local radio and was the subject of intense media scrutiny.  The juvenile court found the state had proven, beyond a reasonable doubt, that the plaintiff had purposely caused Devan's death.  Plaintiff was adjudicated delinquent by reason of murder and committed to the Department of Youth Services until he reached age 21. *See* Judgment Entry filed in the Juvenile Court (Doc. 187, Ex. 7).

A state court of appeals later found that the juvenile court erred when it denied the plaintiff's motion to suppress statements he made during a coercive, custodial interrogation on July 15, 1998, because the statements were elicited in violation of his constitutional right against self-incrimination. *In re Harris*, No.1999AP030013, 2000 WL 748087, at *6 (Ohio Ct.App.

4

June 7, 2000). At a press conference the next day, in response to a question and with knowledge that an appeal to the Ohio Supreme Court would be filed, Ms. Spies stated that "in my heart and in my gut, I feel that Anthony Harris is responsible for the murder of Devan Duniver." Spies Deposition (Doc. 175, Ex. B) at 44-45; 180-81.[2] Ms. Spies subsequently did file a Notice of Appeal. Upon consideration of the jurisdictional question, the Ohio Supreme Court declined jurisdiction and dismissed the appeal. *In re Harris*, 90 Ohio St.3d 1428 (2000). One Justice dissented. Thereafter, the charges were dismissed against the plaintiff. Anthony Harris spent approximately two years in the custody of the State of Ohio.

The Devan Duniver murder investigation remains ongoing and law enforcement still considers the plaintiff a strong suspect in the murder. Captain Urban's testimony also reveals that, at least up to the time of his deposition on December 15, 2004, the plaintiff continued to be the only suspect in the murder investigation. Doc. 165 at 10-11. The police investigation file remains open. Ms. Spies testified that she was aware that the plaintiff was still under investigation by the New Philadelphia Police Department. She had been informed of this through Captain Urban as well as through Captain Urban's request to submit DNA evidence found on the plaintiff's shirt and shorts for further testing.

Subsequent to filing the case at bar and after being rejected by the U.S. Army, the plaintiff applied for service in the U.S. Marine Corps. Upon application to the Marine Corps, on January 28, 2004, the plaintiff signed a Police Record Check release form. *See* Doc. 156-5. This form, along with an express promise of confidentiality, provided Ms. Spies with authorization to

---

[2]Copies of a television broadcast and newspaper article reporting on the news conference are attached as Exhibits 1 and 2 to the Affidavit of Guenther K. Fanter (Doc. 180) at Ex. BB.

5

provide all information regarding the plaintiff's police or juvenile record, including minor traffic violations and whether the plaintiff was then "undergoing court action of any kind." *Id.* at Nos. 12 and 13.  Ms. Spies informed the Marines that the plaintiff would "always" be a suspect in the murder of Devan Duniver "until he is cleared." Doc. 175, Ex. B at 181-83; Baker Deposition (Doc. 163) at 27; Brahen Deposition (Doc. 160) at 32.  She also told Master Sergeant Baker in a brief telephone conversation, "do you know [Anthony Harris is] trying to sue us." Doc. 163 at 22.

The Marine Corps recruiters were aware of the plaintiff's later-reversed conviction for the murder of Devan, as well as this lawsuit, prior to speaking to Ms. Spies.  According to the Marines, the plaintiff's application was denied based upon the recruiter's determination that plaintiff's conviction was reversed on a technicality.  As such, the Marines did not want to risk jeopardizing the image of the Corps.

## II.

On August 29, 2003, the plaintiff, by and through his mother, filed a Complaint (Doc. 1) against seven defendants:  Ms.Spies; Tuscarawas County; three police officers; and two of their respective political subdivisions.  On March 29, 2004, the Court entered a marginal entry order (Doc. 39) that substituted Anthony Harris as plaintiff in the place and stead of his mother. Thereafter, with leave of Court, the plaintiff filed an Amended Complaint (Doc. 70) which named the same defendants and added new allegations against Ms. Spies and Tuscarawas County based on alleged conduct of Ms. Spies subsequent to the filing of the original complaint.

6

After hearings on the Motion for Judgment on the Pleadings of Ms. Spies and Tuscarawas County (Doc. 36), the claims against these defendants were narrowed. *See* Order and Decision (Doc. 81).  As a result of a settlement conference conducted by the Court on February 15, 2005, the plaintiff settled his claims with five of the seven named defendants. *See* Stipulation and Order of Dismissal (Doc. 155).  The only defendants remaining are Ms. Spies and Tuscarawas County.[3]  All that remains are limited claims under 42 U.S.C. § 1983, a 42 U.S.C. § 1985 claim, and claims for aiding and abetting, malicious prosecution, defamation, and tortious interference with a prospective business relationship under Ohio law.

III.

Summary judgment is appropriately granted when

> . . . the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

Fed. R. Civ. P. 56(c). *See also Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005).

The moving party is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party must

_____

[3]Following the settlement, the Court discussed with the plaintiff and the remaining defendants the status of discovery and what, if any, discovery remained to be completed prior to the filing of dispositive motions.  The Court ordered that no other discovery, including depositions discussed following the settlement conference, should be conducted until the Court has issued a decision on the within motion for summary judgment. *See* Order (Doc. 130).

7

"show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial." *Guarino v. Brookfield Tp. Trustees*, 980 F.2d 399, 403 (6th Cir. 1992).  Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute.  Under Fed. R. Civ. P. 56(e),

> . . . an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth *specific facts* showing that there is a genuine issue for trial (emphasis added).

The non-moving party must, in order to defeat the motion, "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant." *Guarino*, 980 F.2d at 403.  In reviewing the motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party when deciding whether a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Assn., Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990).

The United States Supreme Court, in deciding *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), stated that in order for a motion for summary judgment to be granted, there must be no genuine issue of material fact.  *Id.* at 248.  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  In determining whether a factual issue is "genuine" the Court must decide whether the evidence is such that reasonable jurors could find that the non-moving party is entitled to a verdict.  *Id.*  To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank*,

8

916 F.2d 337, 342 (6th Cir. 1990).  The existence of a mere scintilla of evidence in support of the

non-moving party's position ordinarily will not be sufficient to defeat a motion for summary

judgment. *Id.* at 252.

IV.

Ms. Spies and Tuscarawas County move the Court for summary judgment because:

1. Ms. Spies, acting in her role as prosecutor, is entitled to absolute immunity
from Plaintiff's claims;

2. Ms. Spies, prior to acting in her role as prosecutor, is entitled to qualified
immunity from Plaintiff's claims; and

3. The record is devoid of evidence to support the claims against these
Defendants.

A.     *Ms. Spies is Immune from Liability for Plaintiff's § 1983 Claims*

The § 1983 allegations that remain against Ms. Spies involve only claims related to her

role in the improper custodial interrogation, (Doc. 70, ¶ 130(d)) and her role in the arrest and

charging of the plaintiff (*id.*, ¶ 130(e-g)).  Liability under § 1983 is limited by two recognized

exceptions:  qualified immunity and absolute immunity.  Well-established law clearly affirms

that Ms. Spies is immune from civil liability for these claims, even if they are true.

1.     Functioning in Her Role as a Prosecutor, Ms. Spies is Entitled to Absolute
Immunity for Her Role in the Prosecution of the Plaintiff

The Court begins its analysis with the rule that "in determining immunity, we examine

'the nature of the function performed, not the identity of the actor who performed it.'" *Kalina v.*

*Fletcher*, 522 U.S. 118, 127 (1997) (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)).  In

*Kalina*, the Court found that as to the prosecutor's actions in preparing and filing two unsworn

documents, the prosecutor was acting as an advocate of the state in the judicial process;

9

therefore, her actions were protected by absolute immunity. *Id.* at 129.  It is well-established that a prosecuting attorney acting within the scope of her duties in both initiating and pursuing a criminal prosecution is absolutely immune from a civil suit for damages under § 1983 for any allegations of deprivation of the accused's constitutional rights. *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976); *Burns v. Reed*, 500 U.S. 478 (1991); *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993); *Jones v. Shankland*, 800 F.2d 77 (6th Cir. 1986).  Prosecutors are absolutely immune from suit when the conduct complained of relates to their role as advocates for the state in the judicial process. *E.g.*, *Buckley*, 509 U.S. at 273; *Burns*, 500 U.S. at 485–86; *Higgason v. Stephens*, 288 F.3d 868, 877–78 (6th Cir. 2002).  "After judges themselves, prosecutors have historically enjoyed the broadest range of absolute immunity for their actions in the course of criminal prosecutions--broader indeed than that granted police officers or testifying witnesses." *Gregory v. City of Louisville*, --- F.3d ---, 2006 WL 909935, at *11 (6th Cir. April 11, 2006).

"[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns*, 500 U.S. at 486.  Plaintiff argues that Ms. Spies has not met her burden of showing that her decision to arrest the plaintiff is protected by absolute immunity.  The Court agrees.  Ms. Spies maintains that the decision to arrest the plaintiff was made by Captain Urban.  Ms. Spies testified as follows:

> Q.  Who makes the decision whether or not to prepare a *charge*?
> A.  Either myself or the assistant who receives the report.
> Q.  Who made the decision to *charge* Anthony Harris with murder?
> A.  I made the decision *after* Chief Urban determined there was probable
> cause to *arrest* him, and then provided me with a report. (Emphasis added.)

Doc. 175, Ex. B at 366.  Furthermore, she testified:

> I am telling you that Captain Urban made a probable cause determination that
> Anthony Harris should be arrested for the murder of Devan Duniver; and

10

therefore, *based upon my subsequent conversations with him*, a complaint was prepared for him to sign and file in juvenile court. (Emphasis added.)

*Id.* at 372-73.  But, Ms. Spies also testified:

> A.  There was a decision made by Jeff Urban to arrest Anthony, and at that point I returned to my office.
>
> *   *   *
>
> Q.  Did Captain Urban ask you for your input on whether Anthony should be arrested at that point?
> A.  I don't believe that he did.  As I sit here right now, I don't have an independent recollection that he did.
> Q.  Did you offer any input on that subject?
> A.  Not that I recall as I sit here.

*Id.* at 653-54.  Finally, she testified:

> Q.  So I think what you're saying to me, and you can correct me if I'm wrong, that you simply don't recall one way or the other, whether on July 15, 1998, you made the decision to have Anthony Harris arrested for murder and put into jail; is that correct?
> A.  I don't --
> MR. CLEARY:  Objection.
> A.  I don't recall making that decision one way or the other.

*Id.* at 1008-1009.  Ms. Spies also relies on the following testimony of Captain Urban on direct examination during the proceedings in the juvenile court:

> Q.  Where did Anthony go from the police station?
> A.  Anthony went to the Tuscarawas County Attention Center.
> Q.  And what was the purpose of taking him there, please?
> A.  To hold him for charges the following day and for his own safety.
> Q.  When was the decision made that you were going to keep him in detention?
> A.  After I had talked to the county prosecutor.
> Q.  And this was after the questioning of Anthony?
> A.  Yes.
> Q.  And did you at any time, prior to making that decision, tell Anthony he was going to be held?
> A.  No.
> Q.  Did you tell Mrs. Harris, prior to making that decision, that he may be held?
> A.  No.

11

(Doc. 187, Ex. 9, Binder 1) at 181.

Plaintiff cites to the depositions of Captain Urban and Chief Vaughn in support of his contention that the decision to arrest him was made by Ms. Spies.  Captain Urban testified as follows:

> Q.  What did Miss Bornhorst say to you when she was done listening to the tape?
> A.  She told me to take him to the attention center.
> Q.  Did you have any conversation about whether that was an appropriate step?
> A.  No.
> Q.  So --
> A.  I don't think so.
> Q.  -- she directed that you arrest Anthony Harris?
> MR. STIEFVATER:  Object to the form.
> A.  Yes.  Yes.

Doc. 165 at 540.

> Q.  Notwithstanding your feelings or your position on that point [whether the plaintiff should be arrested on July 15th or at a later time], you arrested Anthony on July 15th?
> A.  Yes, I did.
> Q.  And you did that solely because you had been directed to do that by Miss Bornhorst?
> A.  Yes, sir.
> MR. STIEFVATER:  Objection.

*Id.* at 545.  Chief Vaughn testified:

> Q.  Were you present when Anthony was arrested?
> A.  I wasn't present when he was told that he was going to detention or whatever he was told, no.
> Q.  Were you present when Captain Urban decided to arrest Anthony?
> MR. McLANDRICH:  Objection.
> A.  I don't recall that Captain Urban decided that.
> *  *  *
> A.  I believe I was walking into the room or back into the room at some point, and there was discussion, I don't remember specifically that he needed to go to the attention center or whatever term they use, and I don't remember now -- to me it meant that he wasn't going home with his mother that day.

> And I said why not?  And my recollection is Miss Bornhorst said that he was not.  Or something to that effect.  Then -- then I left.
>
> *   *   *
>
> A.  I heard that she -- that -- or got the drift that -- that Anthony wasn't going to go home with his mother that day and I raised the objection, yes.

Vaughn Deposition (Doc. 176, Ex. D) at 646-48.

Ms. Spies arrived at the police station after the plaintiff confessed to murder.  Captain Urban arrested Anthony Harris.  Only after probable cause to arrest existed, did Ms. Spies decide to file charges.  Viewing the evidence in a light most favorable to the plaintiff, the Court holds that absolute immunity attaches only for the role of Ms. Spies in the prosecution of the plaintiff, not for her function in the arrest, because it can not be gleaned from the record whether the conduct objected to was performed by Ms. Spies in an advocacy or an investigatory role. *Burns*, 500 U.S. at 496 (prosecutors are not entitled to absolute immunity for the act of giving legal advice to the police); *see also Prince v. Hicks*, 198 F.3d 607, 614 (plaintiff's complaint sufficed to avoid a Rule 12(b)(6) dismissal on absolute immunity grounds).

2.    Ms. Spies is Otherwise Entitled to Qualified Immunity for Her Role in the Arrest of the Plaintiff

Ms. Spies argues that even were she not to be entitled to absolute immunity for some of her conduct, she merits at least qualified immunity to shield her from liability for it.  Qualified immunity applies to law enforcement officials, including prosecutors, when they perform investigative functions. *Buckley*, 509 U.S. at 273 ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.'")

Qualified immunity protects officials from liability when a reasonable official in the defendant's position would not have understood his or her actions to violate a person's

constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982).  Under the doctrine of

qualified immunity, "government officials performing discretionary functions, generally are

shielded from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known."

*Id.* at 818.

The Court of Appeals for the Sixth Circuit has established a three-step test for evaluating

qualified immunity defenses.  In *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir.2003), the Sixth

Circuit stated the three-part test as follows:

> Qualified immunity involves a three-step inquiry.  First, we determine whether,
> based upon the applicable law, the facts viewed in the light most favorable to the
> plaintiffs show that a constitutional violation has occurred.  Second, we consider
> whether the violation involved a clearly established constitutional right of which a
> reasonable person would have known.  Third, we determine whether the plaintiff
> has offered sufficient evidence "to indicate that what the official allegedly did
> was objectively unreasonable in light of the clearly established constitutional
> rights." *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc) (citing
> *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996)); *see also Saucier v.
> Katz*,
> 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

If the plaintiff fails to establish any one of these elements, qualified immunity must be granted.

*Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005).[4]

Even if Ms. Spies did make the decision to arrest the plaintiff, the Court holds that

decision would be protected by the doctrine of qualified immunity.  Plaintiff alleges that he was

arrested without probable cause. Doc. 70, ¶ 130(e).  As such, qualified immunity applies if a

---

[4]The Supreme Court announced a two-step inquiry for evaluating qualified
immunity claims in *Saucier*.  The Sixth Circuit explained in *Sample v. Bailey*, 409 F.3d
689 (6th Cir. 2005) , however, that its "three-step approach correctly encompasses the
Supreme Court's approach to qualified immunity claims and serves to ensure government
officials the proper protection from civil suit under the law." *Id.* at 696 n. 3.

reasonable person could have believed that probable cause existed to arrest the plaintiff. *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam). At the time the plaintiff was arrested and charged, there was a reasonable basis to conclude that probable cause existed.

Plaintiff repeatedly cites this Court's Order and Decision (Doc. 81) on the Motion for Judgment on the Pleadings of Ms. Spies and Tuscarawas County (Doc. 36) as if this Court's acceptance of the facts alleged as true, as it is obligated to do when considering a motion pursuant to Rule 12, somehow provides the plaintiff with the necessary factual support to survive summary judgment. It does not. *See Wyoming v. Oklahoma*, 502 U.S. 437, 464 (1992) (Scalia, J, dissenting) (when a district court denies a motion for judgment on the pleadings, it need feel no compunction of consistency to deny a subsequently filed motion for summary judgment).

Plaintiff contends that "[e]xcept for the tape recording, there was *no* evidence of Anthony's guilt"at the time he was arrested. Doc. 172 at 23. To the contrary, there is ample evidence to support a reasonable conclusion by Ms. Spies at that time that there was a probability the plaintiff was responsible for the murder of Devan Duniver. He had confessed that he murdered Devan; and there was also substantial evidence to corroborate that confession. Devan's aunt knew about and informed authorities about the prior threat the plaintiff had made on Devan's life. Doc. 187, Ex. 6 at 5. It was corroborated that the plaintiff was walking alone coming home from a friend's house around the time Devan disappeared. *Id.* at 6. In fact, he had been seen entering the wooded area where Devan's body was found just near the time that Devan was last seen, heading for that wooded area. *Id.* Suspiciously, the plaintiff gave the police at least five different versions about where he was and the route he took home before finally admitting the truth. *Id.* at 9. Anthony Harris admitted to a prior act of violence against Devan.

15

*Id.* at 16.  Furthermore, the plaintiff confessed that the murder weapon was a knife owned by a friend of his.  A knife was recovered and, at the time probable cause was determined, was awaiting transportation to the lab for analysis. *Id.* at 18.

The case of *Greene v. Reeves*, 80 F.3d 1101 (6th Cir.1996), lends support to the Court's conclusion that Ms. Spies is entitled to qualified immunity for her role in the arrest of the plaintiff.  In finding that qualified immunity shielded the officials from liability, the Sixth Circuit in *Greene* noted that "a postal worker, a prohibitive mail specialist, a . . . detective, a commonwealth prosecutor, the judge . . ., and a grand jury were sufficiently concerned over the conduct . . . to take action." *Id.* at 1107.  The Sixth Circuit thought it unlikely that all such officials were not only wrong but also unreasonable in their beliefs. *Id.*  Under the circumstances of the case at bar, the Court determines that Ms. Spies did not exceed the "broad range of reasonable professional judgment" accorded her under the doctrine of qualified immunity. *Id.* That the state court of appeals later declared the statements from the plaintiff on July 15, 1998 were elicited in violation of his Fifth Amendment privilege against self-incrimination matters not because officials are "'entitled to qualified immunity [when] their decision was *reasonable*, even if mistaken.'" *Pray v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir. 1995) (alteration and emphasis in original) (quoting *Castro v. United States*, 34 F.3d 106, 112 (2d Cir. 1994)); *see Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (noting that law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity); *see also Armstrong v. City of Melvindale*, 432 F.3d 695, 702 (6th Cir. 2006) (reversing the district court's denial of defendants' motion for summary judgment on qualified immunity grounds).

16

3.　　Ms. Spies is Entitled to Qualified Immunity for Her Role in the Plaintiff's Interrogation Because the Plaintiff Cannot Establish That the Interrogation was so Clearly in Violation of Established Law

Plaintiff argues that Ms. Spies assigned herself to and was active in the investigation of the murder of Devan Duniver.  The Court previously concluded that Ms. Spies is entitled to qualified immunity for the plaintiff's Fourth Amendment claims arising from her preparation on July 1, 1998, of a search warrant application and supporting affidavit that included false facts and her legal advice to the police that they should obtain the consent of Ms. Harris to search her home in lieu of executing the warrant. *See* Doc. 81 at 50-51.  Plaintiff has not, however, presented any factual evidence to support his assertion that Ms. Spies was responsible for the subsequently identified constitutional violations that occurred during the interrogation of him.  A plaintiff cannot avoid summary judgment on the basis of generalizations set forth in opposition to a motion for judgment on the pleadings because, at this stage of the litigation, a nonmoving party cannot rest on "mere allegations" to counter a properly supported motion for summary judgment, but must set forth "specific facts" through affidavits or other evidence. Fed. R. Civ. P. 56(e). *See Liberty Lobby, Inc.*, 477 U.S. at 248-49.

a.　　Plaintiff Cannot Establish That the Interrogation of the Plaintiff was so Clearly in Violation of Established Law Because Even the Ohio Courts Reviewing this Issue Disagreed

Defendants focus on the second step of the three-step qualified immunity analysis in arguing that the plaintiff has failed to establish that the interrogation of him violated clearly established law.  "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

17

The constitutionality of the statements the plaintiff made to Chief Vaughn, during the questioning on July 15, 1998, was tested by the plaintiff just prior to the beginning of the adjudicatory hearing during a hearing on plaintiff's motions to suppress.  The juvenile court ultimately found the confession to be constitutionally sound and admissible at trial.  Therefore, even if the plaintiff could prove any participation by Ms. Spies in the interrogation of him, the constitutional rights that were violated could not have been clearly established. *See Murray v. Earle*, 405 F.3d 278, 291, 289-93 (5th Cir.) (discussing the "breaks the chain of causation" principle) , *cert. denied*, --- U.S. ---, 126 S.Ct. 749 (2005).

        b.      Plaintiff Cannot Establish That Ms. Spies or Tuscarawas County Had Any Part in the Actions That Were Later Determined to Be Constitutionally Infirm

Plaintiff's confession established the existence of probable cause and a complaint followed.  Plaintiff has not produced evidence that demonstrates that Ms. Spies was engaged in any constitutionally questionable conduct.  Indeed, every act for which the plaintiff's confession was later suppressed was attributable to the actions of the police outside of her presence and without her knowledge.  In fact, a review of the opinion of the state appellate court in *In re Harris*, *supra*, confirms that not even a single act of Ms. Spies was cited.

B.     *Tuscarawas County Did Not Violate Plaintiff's Brady Rights*

Plaintiff argues that Tuscarawas County violated the disclosure requirements under *Brady v. Maryland*, 373 U.S. 83 (1963).  *See* Doc. 172 at 18-21.  But this claim was never properly raised because the plaintiff did not seek to amend the complaint again and asserted this new cause of action for violation of his *Brady* rights for the first time in response to the within

18

motion for summary judgment. *See Naples v. Lowellville Police Dept.*, 125 Fed. Appx. 636, 644 (6th Cir. 2005).

Plaintiff contends that Ms. Spies knew that the plaintiff's defense in the juvenile court proceedings was that someone else murdered Devan and that one suspect was Jamie Redmond.[5] Assuming *arguendo* that the Amended Complaint (Doc. 70) sets forth a claim for violation of the plaintiff's *Brady* rights, the Court finds that there is no *Brady* violation because the claim is factually unsupported. Plaintiff was aware of the essential facts that would enable him to take advantage of the exculpatory evidence regarding Redmond. Furthermore, a reasonable defendant would have looked for the records from Children's Services in Columbus that showed that Redmond had physically beaten Devan around the time he abducted her. *See Spirko v. Mitchell*, 368 F.3d 603, 610-11 (6th Cir. 2004).

C.      *Plaintiff's § 1985 Claim Fails Because the Record is Devoid of any Evidence of Race-Based Animus by Either Ms. Spies or Tuscarawas County*

Plaintiff also seeks damages under 42 U.S.C. § 1985 for the defendants' alleged conspiracy to deprive him of his constitutional rights. The Amended Complaint describes the existence of an agreement between Ms. Spies and the three police officers to deprive Anthony Harris of several constitutional rights, including the right to equal protection of the law. To state a claim under § 1985(3), a plaintiff must allege: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws; and (3) an act in furtherance of the

---

[5]A drug-addicted convicted felon living in Columbus, who was in a relationship with Devan's mother. He was under court order to stay away from Devan since abducting her in 1997.

conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Bhd. of C & J v. Scott*, 463 U.S. 825, 828-29 (1983).  The acts which are alleged to have deprived the plaintiff of equal protection must be the result of class-based discrimination. *See Newell v. Brown*, 981 F.2d 880, 886 (6th Cir. 1992).

Plaintiff states at page 30 of Doc. 172 that "Anthony requests, pursuant to Fed. R. Civ. P. 56(f), that this Court defer ruling on Anthony's conspiracy claim under § 1985 until discovery can be completed."  Under Rule 56(f), a court may delay ruling on a summary judgment motion or refuse the motion altogether if it finds that the party opposing summary judgment has established a need for additional discovery.  The Sixth Circuit has interpreted Rule 56(f) to require that a party opposing a summary judgment motion must "file an affidavit that 'indicate[s] to the district court its need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information.'" *Gettings v. Building Laborers Local 310 Fringe Benefits Fund*, 349 F.3d 300, 305 (6th Cir. 2003) (quoting *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000)).  The Court finds that the plaintiff has failed to comply with the requirements of Rule 56(f). *United States v. Dairy Farmers of America, Inc.*, 426 F.3d 850, 863 (6th Cir. 2005).

In addition to the months of recorded testimony in the juvenile court proceedings, extensive discovery already has been completed in this case, including numerous and extensive depositions.  Plaintiff, however, does not demonstrate any fact of record to establish that he was a victim of a conspiracy against him predicated on some "class-based animus."  Simply stated, there is no factual evidence to support a claim of racial discrimination.  Since the plaintiff has

not established that the actions of Ms. Spies and Tuscarawas County were motivated by a racial

or other class-based invidiously discriminatory animus, his Second Claim for Relief in the

Amended Complaint (Doc. 70) brought pursuant to §1985 also fails.

D.     *Plaintiff Cannot Establish His Claim for First Amendment Retaliation*

Plaintiff alleges in his Sixth Claim for Relief that Ms. Spies and Tuscarawas County

violated his First Amendment right to petition the government for redress of a grievance.

Plaintiff alleges that Ms. Spies, acting for the County, violated these rights when she responded

to the inquiry of the Marine Corps by stating that the plaintiff continued to be a suspect and

would always be a suspect because there were no other suspects.  Plaintiff asserts that this

statement was made to punish him for exercising his right of access to the courts and to deter

him from continuing to litigate the case at bar.

The Sixth Circuit has held that a § 1983 claim can be predicated upon a state official's

retaliation against an individual for exercising his First Amendment rights. *Thaddeus-X v.*

*Blatter*, 175 F.3d 378, 394-95 (6th Cir. 1999) (en banc).  "A retaliation claim essentially entails

three elements:  (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken

against the plaintiff that would deter a person of ordinary firmness from continuing to engage in

that conduct; and (3) there is a causal connection between elements one and two-- that is, the

adverse action was motivated at least in part by the plaintiff's protected conduct." *Id.* at 394.

Plaintiff is unable to sustain his burden as to the second and third prongs of the three-part

test for evaluating retaliation claims.

21

1.     The Record is Clear That the Statement of Ms. Spies' was not the Cause of the Rejection of the Plaintiff by the U.S. Marine Corps Nor was Her Statement Sufficiently Threatening to Quell the Litigious Urges of a Person of Objectively Ordinary Resolve

According to the Marine Corps, the plaintiff's application was denied based upon the determination that his conviction was reversed on a technicality.  Master Sergeant Baker testified as follows:

> And the second reason, the biggest reason why he wouldn't understand is that he was off on a technicality because his Miranda rights were not read to him, I guess, in front of an adult or something like that.  And that was the biggest reason why that the Marine Corps said no was because of that.

Doc. 163 at 27.  Captain Gonzalez testified:

> Q.  What was the information that was given to you in that first conversation then, so that we know what Anthony Harris told Baker that was told to you, the initial information?  Do you have a recollection of that?
> A.  In a nutshell, it was he was convicted of murder, but got released because of the technicality.
> Q.  What was your essential response to Baker at that time?  Did you want to pursue that individual or not?
> A.  No, I did not.

Gonzalez Deposition (Doc. 162) at 25.  In the eyes of the Marines, the suppression of the plaintiff's confession by the state appellate court did not negate its existence.  As such, the plaintiff was not viewed as a suitable candidate for service in the Marine Corps.  The U.S. Army reached the same conclusion without the benefit of Ms. Spies' insight into the matter.  The information provided by Ms. Spies (in response to a government inquiry), was truthful.  Anthony Harris is still a suspect in the murder of Devan Duniver.

The statement of Ms. Spies did not stop the plaintiff from proceeding with this civil suit. There is absolutely no evidence that her conversation with the Marine Corps recruiter had any effect on the conduct of the plaintiff whatsoever, let alone that it caused him to abandon the case

22

at bar. There is nothing in the record to suggest that Ms. Spies knew or had reason to know that her statement to a Marine Corps recruiter conducting a government investigation of the plaintiff would eventually become public, non-confidential information.

This case is similar to the case of *Neier v. City of Pemberville*, No. 99-3104, 2000 WL 32008 (6th Cir. Jan.4, 2000), wherein the court found that the defendant's actions would not "chill a person of ordinary firmness from exercising his or her First Amendment rights, and it clearly had no such effect on plaintiff. After [the defendant]'s alleged threat, plaintiff maintained his claims." *Id.* at *4. Similarly, the plaintiff has maintained his claims in the case at bar.

      2.      Plaintiff is Still a Suspect - the Fact That Ms. Spies Has Said so Both Before and after this Lawsuit was Filed Proves That There is No Connection Between this Lawsuit and Her Statement

The statement of Ms. Spies to the Marine Corps recruiter was motivated by the strength of her belief and her desire to provide accurate information, rather than any attempt to intimidate the plaintiff into abandoning the case at bar.

E.     *The Record Does Not Support the Plaintiff's Claim for Aiding and Abetting Against Ms. Spies and Tuscarawas County*

Plaintiff alleges in his Third Claim for Relief in the Amended Complaint (Doc. 70) that each of the defendants had actual knowledge of a scheme to violate his constitutional rights and that the defendants provided substantial assistance to each other in perpetrating these alleged violations. Plaintiff further states that each of the defendants had actual knowledge that the plaintiff's constitutional rights were being violated at the time each defendant provided substantial assistance to the other defendants.

23

Proof of two elements is required to establish a claim for civil aiding and abetting.  A plaintiff must prove that the person charged with the tort (1) knew that the primary party's conduct constituted a breach of duty and (2) gave substantial assistance or encouragement to the primary party in carrying out the breach. *Aetna Cas. & Sur. Co. v. Leahey Constr. Co., Inc.*, 219 F.3d 519, 533 (6th Cir. 2000).  Aiding and abetting liability requires proof that a defendant "associated himself with the venture, participated in it as something he wished to bring about, and sought by his actions to make it succeed." *Wilson v. Town of Mendon*, 294 F.3d 1, 15 (1st Cir. 2002) (quoting *United States v. Garcia-Rosa*, 876 F.2d 209, 217 (1st Cir. 1989)).  Mere presence does not establish the existence of liability for aiding and abetting. *Id.*

Based upon the indisputable facts in the record, it is clear that Ms. Spies had no knowledge that either Chief Vaughn or Captain Urban's conduct was a breach of duty; and that she provided neither substantial assistance nor encouragement to Urban or Vaughn in carrying out their allegedly tortious acts.  As such, this claim fails as a matter of law.

F.    *Plaintiff's Claim of Malicious Prosecution Under Ohio Law Fails Against Tuscarawas County*[6]

In Ohio, the elements of malicious criminal prosecution are:  (1) malicious institution of prior proceedings; (2) lack of probable cause; and (3) termination of the prior proceedings in the plaintiff's favor. *Trussell v. Gen. Motors Corp.*, 53 Ohio St.3d 142, 145 (1990).  Tuscarawas County can obtain summary judgment by establishing probable cause for the plaintiff's arrest. This claim will be dismissed because the plaintiff's confession alone provided probable cause to initiate and pursue the criminal charge against him.  The mere fact that charges are subsequently

---

[6]The Court previously dismissed the claim for malicious prosecution against Ms. Spies because she is absolutely immune pursuant to state law. *See* Doc. 81 at 61-62.

24

dropped against a defendant is of no consequence in the determination of probable cause. *Ireland v. Tunis*, 113 F.3d 1435, 1449-50 (6th Cir. 1997).

As previously stated, there was substantial evidence to corroborate the plaintiff's confession.  Devan's aunt knew about and informed authorities about the prior threat the plaintiff had made on Devan's life. Doc. 187, Ex. 6 at 5.  It was corroborated that the plaintiff was walking alone coming home from a friend's house around the time Devan disappeared. *Id.* at 6. In fact, he had been seen entering the wooded area where Devan's body was found just near the time that Devan was last seen, heading for that wooded area. *Id.*  Suspiciously, the plaintiff gave the police at least five different versions about where he was and the route he took home before finally admitting the truth. *Id.* at 9.  Finally, Anthony Harris admitted to previously knocking Devan down. *Id.* at 16.

Plaintiff correctly states that although malice is the "ultimate issue," *Criss v. Springfield Twp.*, 56 Ohio St.3d 82, 86 (1990), this particular state of mind can be inferred from a lack of probable cause.  Plaintiff, however, can point to no direct evidence supporting the first element of a malicious criminal prosecution.

G.      *The Statements of Opinion and Truth by Ms. Spies are Not Defamatory*

The First Amendment to the United States Constitution[7] protects expressions of opinion and generally grants opinions absolute immunity from a defamation claim. *Scott v.*

---

[7]Although the Ohio Constitution provides "separate and independent" protection of opinion from that provided by the U.S. Constitution, the Ohio Supreme Court has found that the disparity between the two "may be considered a distinction without a difference . . . ." *Vail v. Plain Dealer Publishing Co.*, 72 Ohio St.3d 279, 281 (1995).

*The News-Herald*, 25 Ohio St.3d 243, 250 (1986).  Furthermore, truth is always a defense in any action for defamation in Ohio.[8] *Shifflet v. Thomson Newspapers, Inc.*, 69 Ohio St.2d 179, 183 (1982).

      1.      "In My Heart and in My Gut, I Feel that Anthony Harris Is Responsible for the Murder of Devan Duniver" is a Statement of Opinion

The determination as to whether an alleged defamatory statement is an opinion or fact is a question of law for this Court to resolve. *Scott*, 25 Ohio St.3d at 250.  The Court must examine the statement under the totality of the circumstances when determining whether it is fact or opinion. *Id.*  A court should look at four factors when considering the totality of the circumstances:  (1) the specific language used; (2) whether the statement is verifiable; (3) the general context of the statement; and (4) the overall broader context in which the statement is made. *Id.*

The specific language used in the case at bar is "in my <u>heart</u> and in my <u>gut</u>, I <u>feel</u> that Anthony Harris is responsible for the murder of Devan Duniver." (Emphasis added.)  Ms. Spies argues that this statement, when looking at the specific language, is clearly opinion.  She was merely expressing feelings in her heart and in her gut.  The Court agrees.

The question of whether Ms. Spies implies that she has first-hand knowledge that substantiates the opinion asserted must be considered in assessing whether the statement is

---

      [8]Ohio Rev. Code § 2739.02 concerns the defense of truth in actions for libel or slander, and states:

           In an action for a libel or a slander, the defendant may allege and prove the truth of the matter charged as defamatory.  *Proof of the truth thereof shall be a complete defense.*  In all such actions any mitigating circumstances may be proved to reduce damages. (Emphasis added.)

verifiable.  *Vail*, 72 Ohio St.3d at 283.  "[W]here the '. . . statement lacks a plausible method of verification, a reasonable reader will not believe that the statement has specific factual content.'" *Scott*, 25 Ohio St.3d at 251-52 (quoting *Ollman v. Evans*, 750 F.2d 970, 979 (D.C.Cir. 1984) (en banc).  Ms. Spies described her personal feelings within her heart and gut, which are not independently verifiable.  Therefore, a reasonable reader or listener would not believe that her statement has specific factual content.

Moreover, the context in which the statement was made diminishes any potential defamatory effect.  Ms. Spies made the statement after Anthony Harris (whom she had prosecuted and who was convicted) was released due to the appellate court's finding that the incriminating statements made by the plaintiff should have been suppressed by the juvenile court.  Shortly after the plaintiff was released from the Department of Youth Services, and in response to statements in the media, Ms. Spies entertained a press conference.  Her statement was made in response to a question prompted by press interest in the case.  Based upon the totality of the circumstances, the Court is convinced that the ordinary listener would accept this statement as opinion and not as fact.

2.      "Anthony Harris Continues to Be and Always Will Be a Suspect of the Crime Because There Are No Other Suspects" is Truth

Plaintiff cites to the deposition testimony of Captain Urban[9] and declares that he testified that this statement of Ms. Spies is untrue. Doc. 172 at 33, n. 26.  A review of the deposition testimony, however, leads the Court to conclude that Captain Urban did not testify that the

---

[9]Doc. 165 at 691-94.

27

statement is untrue, rather he testified:

> Q.  Do you agree that Anthony Harris will always be a
> suspect of the murder of Deven Duniver?
> A.  Not necessarily.
> Q.  And that's because somebody else might be found to
> have committed that murder, right?
> A.  It's possible.
> Q.  Or there may be some kind of an advance in a DNA test
> that would prove conclusively that Anthony Harris couldn't have
> done it?
> A.  That's correct.
> Q.  So would you agree with me it's inappropriate and
> inaccurate to state that Anthony Harris will always be a suspect of
> the murder of Devan Duniver?
> A.  In my --
> MR. STIEFVATER:  Objection.
> Q.  Go ahead.
> A.  In my opinion, yes.

Doc. 165 at 694.

In considering the statement at issue, the Court concludes that the truth of the statement negates the alleged defamation claim set forth by the plaintiff. *Strickland v. Tower City Mgt. Corp.*, No. 71839, 1997 WL 793133, at *7 (Ohio Ct.App. Dec. 24, 1997) (When a defendant is able to demonstrate the truth of the allegedly defamatory statement, summary judgment can properly be granted.)  Thus, the Court finds that Ms. Spies is entitled to summary judgment on the plaintiff's defamation claim.

*H.      Plaintiff's Tortious Interference with Prospective Business Relationship Claim Fails for a Number of Reasons*

Plaintiff alleges in his Seventh Claim for Relief in the Amended Complaint (Doc. 70) that Ms. Spies tortiously interfered with his prospect of entering the U.S. Marine Corps by informing a recruiter that contacted her that Anthony Harris would "always" and "forever" be a suspect in the murder of Devan Duniver.

28

As stated by the state court of appeals in *Telxon Corp. v. Smart Media of Delaware, Inc.*, Nos. 22098 & 22099,  2005 WL 2292800 (Ohio Ct.App. Sept. 21, 2005),

> The elements of tortious interference with a business relationship are (1) a business relationship, (2) known to the tortfeasor, and (3) an act by the tortfeasor that adversely interferes with that relationship, (4) done without privilege and (5) resulting in harm. *Brookeside Ambulance, Inc. v. Walker Ambulance Serv.* (1996), 112 Ohio App.3d 150, 155-56, 678 N.E.2d 248.  Specifically, element three requires an act that "causes a *third person* not to enter into or continue a business relation with another." (Emphasis added.) *A & B-Abell Elevator Co., Inc. v. Columbus/Central Ohio Bldg. & Constr. Trades Council* (1995), 73 Ohio St.3d 1, 14, 651 N.E.2d 1283, 1995-Ohio-66.  Also, this act must be done maliciously, "i.e., [with] knowledge of falsity or reckless disregard for the truth." *Id.* at 15, 651 N.E.2d 1283.  Finally, it is worth emphasizing element four, that the interference must be without privilege. *See Fred Siegel Co., LPA v. Arter & Hadden* (1999), 85 Ohio St.3d 171, 176, 707 N.E.2d 853, 1999-Ohio-260.

*Id.* at *32.  Tortious interference with business relationships includes intentional interference with prospective contractual relations not yet reduced to a contract. *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co., Inc.*, 148 Ohio App.3d 596, 604 (2002), *citing  Lapping v. HM Health Serv.*, No.2000-T-0061, 2001 WL 1602683 (Ohio Ct.App. Dec. 14, 2001).  The record in the case at bar, however, establishes that the Marines were going to reject the plaintiff even without the statement of Ms. Spies.  Further, the plaintiff specifically authorized Ms. Spies to make such a statement. *See* Police Record Check release form. Doc. 156-5.

1.    The U.S. Marine Corps Considered the Plaintiff's Conviction to be Reversed on a Technicality and, as Such, Did Not Consider Him a Suitable Candidate for the Corps

Plaintiff was not going to be accepted into the Marines, even absent Ms. Spies informing the recruiter that he was still a murder suspect.  The recruiters were aware that the plaintiff had been convicted for murdering Devan Duniver, that the conviction was later reversed, and about the existence of the case at bar prior to speaking to Ms. Spies.  According to the U.S. Marine

29

Corps, the plaintiff's application was denied based upon the recruiter's determination that his conviction was reversed on a technicality. As such, the Marines did not want to risk jeopardizing the image of the Corps.

> 2.    The Statement of Ms. Spies was Authorized by the Plaintiff

The Police Record Check release form (Doc. 156-5) permitted Ms. Spies, under a cloak of confidentiality, to provide the Marine Corps recruiters with the information they requested, *i.e.*, identification of past juvenile record and any current or pending court action. *Id.* at Nos. 12 and 13. The Marine Corps recruiters contacted and questioned Ms. Spies in accordance with their policy. Ms. Spies responded to their questions completely and truthfully, as she was authorized to do. That is not to say, however, that the Court condones her impudent statement to Staff Sergeant Brahen.[10]

> 3.    The Statement of Ms. Spies was Privileged

As previously stated, the interference must be without privilege. An individual may be privileged to act in a manner that would otherwise satisfy the elements of this claim. *Juhasz v. Quik Shops, Inc.*,55 Ohio App.2d 51, 57 (1977). The applicability of a qualified privilege has been recognized by Ohio courts in both defamation and tortious interference cases. *See Smith v. Klein*, 23 Ohio App.3d 146, 148 (1985). The Court finds that the statement of Ms. Spies, made in response to a request for information by the Marine Corps recruiters, was privileged because of the Police Record Check release form (Doc. 156-5) signed by the plaintiff. Furthermore, the

---

[10]When Staff Sergeant Brahen went to the prosecutor's office and asked how he would go about getting the plaintiff's records, he was told that he would have to speak with Ms. Spies. Staff Sergeant Brahen testified: "At the time Miss Spies came out of the office, said are you fucking kidding me." Doc. 160 at 25-26.

statement was true.  As stated by a state court of appeals in *Ohio State Home Serv., Inc. v. Better Business Bur. of Akron, Inc.*, 89 Ohio App.3d 732 (1993):

> Similarly, summary judgment was appropriately granted as to the claim for tortious interference with business relationships.  The qualified privilege and the requirement that the movant show actual malice are the same for business interference as those discussed in regard to defamation.

*Id.* at 736.  Summary judgment will be entered in favor of Ms. Spies on the plaintiff's claim for tortious interference with prospective business relationship.

V.

The Motion for Summary Judgment of defendants Amanda Spies and County of Tuscarawas, Ohio (Doc. 156-1) is GRANTED upon the grounds that there is no genuine issue as to any material fact and the movants are entitled to a judgment as a matter of law.  Judgment will be entered in favor of defendants Amanda Spies and County of Tuscarawas, Ohio and against the plaintiff on the Amended Complaint.


IT IS SO ORDERED.


 May 16, 2006                              /s/ John R. Adams
Date                                       John R. Adams
                                           U.S. District Judge